# Exhibit 1

**8910** Federal Register / Vol. 86, No. 26 / Wednesday, February 10, 2021 / Notices

with the standards of section 4 of the BHC Act.

Unless otherwise noted, comments regarding the applications must be received at the Reserve Bank indicated or the offices of the Board of Governors, Ann E. Misback, Secretary of the Board, 20th Street and Constitution Avenue NW, Washington, DC 20551–0001, not later than February 25, 2021.

*A. Federal Reserve Bank of Minneapolis* (Chris P. Wangen, Assistant Vice President), 90 Hennepin Avenue, Minneapolis, Minnesota 55480–0291:

1. *McIntosh County Bank Holding Company, Inc., Ashley, North Dakota;* through its subsidiary bank holding company, North Star Holding Company, Inc., and subsidiary bank, Unison Bank, both of Jamestown, North Dakota, to indirectly retain voting shares of AccuData Services, Inc., Park River, North Dakota, and thereby engage in certain data processing activities pursuant to section 225.28(b)(14)(i) of the Board's Regulation Y.

Board of Governors of the Federal Reserve System, February 5, 2021.

**Michele Taylor Fennell,**
*Deputy Associate Secretary of the Board.*
[FR Doc. 2021–02764 Filed 2–9–21; 8:45 am]
**BILLING CODE P**

## FEDERAL RESERVE SYSTEM

### Change in Bank Control Notices; Acquisitions of Shares of a Bank or Bank Holding Company

The notificants listed below have applied under the Change in Bank Control Act (Act) (12 U.S.C. 1817(j)) and § 225.41 of the Board's Regulation Y (12 CFR 225.41) to acquire shares of a bank or bank holding company. The factors that are considered in acting on the applications are set forth in paragraph 7 of the Act (12 U.S.C. 1817(j)(7)).

The public portions of the applications listed below, as well as other related filings required by the Board, if any, are available for immediate inspection at the Federal Reserve Bank(s) indicated below and at the offices of the Board of Governors. This information may also be obtained on an expedited basis, upon request, by contacting the appropriate Federal Reserve Bank and from the Board's Freedom of Information Office at *https://www.federalreserve.gov/foia/request.htm.* Interested persons may express their views in writing on the standards enumerated in paragraph 7 of the Act.

Comments regarding each of these applications must be received at the

Reserve Bank indicated or the offices of the Board of Governors, Ann E. Misback, Secretary of the Board, 20th Street and Constitution Avenue NW, Washington, DC 20551–0001, not later than February 25, 2021.

*A. Federal Reserve Bank of Atlanta* (Kathryn Haney, Assistant Vice President) 1000 Peachtree Street NE, Atlanta, Georgia 30309. Comments can also be sent electronically to *Applications.Comments@atl.frb.org:*

1. *Jeremy Francis Gilpin, South Lake Tahoe, California, and Jeffrey Alan Smith, Atlanta, Georgia;* as a group acting in concert, to acquire voting shares of Community Bankshares, Inc., LaGrange, Georgia and its subsidiaries, Community Bank and Trust—West Georgia, also of LaGrange, Georgia, and Community Bank and Trust—Alabama, Union Springs, Alabama.

Board of Governors of the Federal Reserve System, February 5, 2021.

**Michele Taylor Fennell,**
*Deputy Associate Secretary of the Board.*
[FR Doc. 2021–02765 Filed 2–9–21; 8:45 am]
**BILLING CODE P**

## FEDERAL TRADE COMMISSION

[File No. 192 3123]

### Amazon Flex; Analysis of Proposed Consent Order To Aid Public Comment

**AGENCY:** Federal Trade Commission.
**ACTION:** Proposed consent agreement; request for comment.

**SUMMARY:** The consent agreement in this matter settles alleged violations of federal law prohibiting unfair or deceptive acts or practices. The attached Analysis of Proposed Consent Order to Aid Public Comment describes both the allegations in the draft complaint and the terms of the consent order— embodied in the consent agreement— that would settle these allegations.

**DATES:** Comments must be received on or before March 12, 2021.

**ADDRESSES:** Interested parties may file comments online or on paper by following the instructions in the Request for Comment part of the **SUPPLEMENTARY INFORMATION** section below. Please write "Amazon Flex; File No. 192 3123" on your comment, and file your comment online at *https://www.regulations.gov* by following the instructions on the web-based form. If you prefer to file your comment on paper, mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex D), Washington, DC

20580, or deliver your comment to the following address: Federal Trade Commission, Office of the Secretary, Constitution Center, 400 7th Street SW, 5th Floor, Suite 5610 (Annex D), Washington, DC 20024.

**FOR FURTHER INFORMATION CONTACT:** Guy C. Ward (312–960–5612), Midwest Regional Office, John C. Kluczynski Federal Building, 230 South Dearborn Street, Suite 3030, Chicago, IL 60604.

**SUPPLEMENTARY INFORMATION:** Pursuant to Section 6(f) of the Federal Trade Commission Act, 15 U.S.C. 46(f), and FTC Rule 2.34, 16 CFR 2.34, notice is hereby given that the above-captioned consent agreement containing a consent order to cease and desist, having been filed with and accepted, subject to final approval, by the Commission, has been placed on the public record for a period of thirty (30) days. The following Analysis to Aid Public Comment describes the terms of the consent agreement and the allegations in the complaint. An electronic copy of the full text of the consent agreement package can be obtained at *https://www.ftc.gov/news-events/commission-actions.*

You can file a comment online or on paper. For the Commission to consider your comment, we must receive it on or before March 12, 2021. Write "Amazon Flex; File No. 192 3123" on your comment. Your comment—including your name and your state—will be placed on the public record of this proceeding, including, to the extent practicable, on the *https://www.regulations.gov* website.

Due to the COVID–19 pandemic and the agency's heightened security screening, postal mail addressed to the Commission will be subject to delay. We strongly encourage you to submit your comments online through the *https://www.regulations.gov* website.

If you prefer to file your comment on paper, write "Amazon Flex; File No. 192 3123" on your comment and on the envelope, and mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex D), Washington, DC 20580; or deliver your comment to the following address: Federal Trade Commission, Office of the Secretary, Constitution Center, 400 7th Street SW, 5th Floor, Suite 5610 (Annex D), Washington, DC 20024. If possible, submit your paper comment to the Commission by courier or overnight service.

Because your comment will be placed on the publicly accessible website at *https://www.regulations.gov,* you are

solely responsible for making sure your comment does not include any sensitive or confidential information. In particular, your comment should not include sensitive personal information, such as your or anyone else's Social Security number; date of birth; driver's license number or other state identification number, or foreign country equivalent; passport number; financial account number; or credit or debit card number. You are also solely responsible for making sure your comment does not include sensitive health information, such as medical records or other individually identifiable health information. In addition, your comment should not include any ''trade secret or any commercial or financial information which . . . is privileged or confidential''—as provided by Section 6(f) of the FTC Act, 15 U.S.C. 46(f), and FTC Rule 4.10(a)(2), 16 CFR 4.10(a)(2)—including in particular competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

Comments containing material for which confidential treatment is requested must be filed in paper form, must be clearly labeled ''Confidential,'' and must comply with FTC Rule 4.9(c). In particular, the written request for confidential treatment that accompanies the comment must include the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. *See* FTC Rule 4.9(c). Your comment will be kept confidential only if the General Counsel grants your request in accordance with the law and the public interest. Once your comment has been posted on the *https://www.regulations.gov* website—as legally required by FTC Rule 4.9(b)—we cannot redact or remove your comment from that website, unless you submit a confidentiality request that meets the requirements for such treatment under FTC Rule 4.9(c), and the General Counsel grants that request.

Visit the FTC website at *http://www.ftc.gov* to read this Notice and the news release describing the proposed settlement. The FTC Act and other laws that the Commission administers permit the collection of public comments to consider and use in this proceeding, as appropriate. The Commission will consider all timely and responsive public comments that it receives on or before March 12, 2021. For information on the Commission's privacy policy, including routine uses permitted by the Privacy Act, see *https://www.ftc.gov/site-information/privacy-policy.*

**Analysis of Proposed Consent Order To Aid Public Comment**

The Federal Trade Commission (''Commission'') has accepted, subject to final approval, an agreement containing a consent order from Amazon.com, Inc. and Amazon Logistics, Inc. (''Amazon''). The proposed consent order has been placed on the public record for 30 days for receipt of comments from interested persons. Comments received during this period will become part of the public record. After 30 days, the Commission will again review the agreement and the comments received, and will decide whether it should withdraw from the agreement and take appropriate action or make final the agreement's proposed order.

Amazon operates Amazon Flex, a gig economy program through which consumers can become ''drivers'' for Amazon and, using their own vehicles, deliver products and groceries to Amazon customers. Amazon pays drivers for making deliveries, and for some types of deliveries, allows customers to tip the drivers via the app or website used to place the order. Amazon consistently represents to both drivers and customers that it passes on 100% of customer tips to drivers. However, from late 2016 through August 2019, Amazon withheld nearly a third of the tips meant for drivers, about $61 million in total, despite its representations that it would provide drivers 100% of customer tips. Amazon continued diverting drivers' tips in this way for over two and a half years despite hundreds of complaints from drivers and critical media reports. Amazon changed its practices only after the FTC issued a Civil Investigative Demand to the company in May 2019.

The Commission's proposed complaint alleges that Amazon has violated Section 5 of the FTC Act. In particular, the proposed complaint alleges Amazon misrepresented to both customers and drivers that it would give drivers 100% of customer tips in addition to the pay Amazon offered.

The proposed order includes equitable monetary relief and injunctive provisions to prevent Amazon from engaging in the same or similar acts or practices in the future. Part I of the proposed order prohibits Amazon from misrepresenting to any consumer, including both customers and drivers: (a) The income a driver is likely to earn, (b) the amount Amazon will pay drivers, (c) that Amazon will give drivers customer tips in addition to Amazon's contribution to drivers' earnings, (d) the percentage or amount of any customer tip a driver will receive, or (e) that any amount customers pay is a tip. Part II of the proposed order prohibits Amazon from changing the extent to which it uses a driver's tips toward Amazon's contribution to the driver's earnings without first obtaining express informed consent from the driver.

Part III of the proposed order requires Amazon to pay $61,710,583—the full amount of tips that Amazon improperly withheld from drivers. Part IV of the proposed order requires Amazon to provide sufficient information about drivers to enable the Commission to administer redress efficiently to drivers.

Parts V through VIII of the proposed order are reporting and compliance provisions. Part V requires acknowledgments of the order. Part VI requires Amazon to notify the Commission of changes in corporate status for 10 years and mandates that the company submit an initial compliance report to the Commission. Part VII requires Amazon to create certain documents relating to its compliance with the order for 10 years and to retain those documents for a 5-year period. Part VIII mandates that the company make available to the Commission information or subsequent compliance reports, as requested.

Finally, Part IX states that the proposed order will remain in effect for 20 years, with certain exceptions.

The purpose of this analysis is to aid public comment on the proposed order. It is not intended to constitute an official interpretation of the complaint or proposed order, or to modify in any way the proposed order's terms.

By direction of the Commission.

**April J. Tabor,**
*Secretary.*

**Joint Statement of Acting Chairwoman Rebecca Kelly Slaughter and Commissioner Noah Joshua Phillips**

The internet-enabled gig economy is substantial and continues to grow. According to one study, U.S. families earning income from the internet-enabled gig economy rose from under 2% of the sample in 2013 to 4.5% by early 2018, with more than 5 million U.S. households earning some income from this type of work by 2018.[1]

---

[1] *See* Diana Farrell, Fiona Greig & Amar Hamoudi, *The Online Platform Economy in 2018: Drivers, Workers, Sellers and Lessors,* JPMorgan Chase & Co. Institute (2018) at 23, *https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-ope-2018.pdf.* Particularly because of high turnover, with many workers spending only a few months participating, estimates of the gig economy are difficult and inconsistent. Another study estimated that there were 1.6 million American workers in the internet-enabled gig economy in 2017, or 1% of the
Continued

Another study estimates worldwide transaction volume of $204 billion in 2018, which will more than double to $455 billion by 2023.[2]

Consumer demand for the services offered by the gig economy surely contributes to this growth. But it would not be possible without the contributions of drivers, shoppers, designers, and other gig workers, whether seeking supplemental income or relying on one gig or a patchwork of gigs to get by.

The impact of the internet-enabled gig economy on workers is a matter of robust debate in Congress, state legislatures, popular referenda, academia, and elsewhere. The two authors of this joint statement may not agree on every aspect of this debate, including whether this novel business model is, on net, beneficial for consumers and workers.

Where we do agree—and what this case reflects—is the platforms that facilitate this gig economy must treat their workers fairly and non-deceptively, just as they must consumers, and the Federal Trade Commission should work to ensure they do. That is why this case resolving our investigation into Amazon.com, Inc.'s and its subsidiary Amazon Logistics, Inc.'s (collectively, "Amazon") treatment of delivery drivers is so important.

The conduct alleged in the complaint is outrageous. According to the complaint, Amazon recruited delivery drivers (and, possibly, attracted customers) by promising that drivers would collect all the tips awarded them by Amazon customers. At a certain

point, it decided to divert thirty percent of those tips from drivers to the company to subsidize the amounts it had committed to paying its drivers. The complaint alleges Amazon then went to great lengths to ensure no one would figure out what it was doing, by changing the way it presented earnings to drivers and drafting misleading answers for service representatives to give to drivers upset at being short-changed.

Our settlement with Amazon ensures these drivers will get back every dollar that was promised, every dollar that a customer chose to give as a tip for their service. That is a good result for an enforcement action under the FTC Act, the law we apply today. But we believe, given the importance of candor and fairness to workers in the gig economy, our current authorities could be improved. Congress can give us direct penalty authority to deter deception aimed at workers in the internet-enabled gig economy and rulemaking authority under the Administrative Procedure Act to address systemic and unfair practices that harm those workers.

Clear rules and the threat of substantial civil penalties can deter wrongdoing. The authors of this statement do not always agree on the proper scope of rulemaking and penalty authority, but we do agree here. Authorizing the FTC to assess penalties to deter similar lawbreaking will help gig workers and make labor markets more efficient. The internet-enabled gig economy is new, innovative, and growing. We believe the modest reforms we propose here can help gig workers have a fairer shake at getting their benefit of the bargain from that growth, too.

**Statement of Commissioner Rohit Chopra**

Today, the FTC is sanctioning Amazon.com (NASDAQ: AMZN) for expanding its business empire by cheating its workers. In 2015, Amazon launched Flex, a package delivery service that was widely seen as a challenge to FedEx and UPS.[3] To recruit drivers, the company promised to pay them a minimum of $18 to $25 an hour, plus tips.[4] But once the service was off the ground, in late 2016, Amazon changed course. The Commission's complaint charges that the company secretly began cutting its payments to drivers, and siphoning their tips to

make up the difference.[5] In total, Amazon stole nearly one-third of drivers' tips to pad its own bottom line.

This theft did not go unnoticed by Amazon's drivers, many of whom expressed anger and confusion to the company. Rather than coming clean, Amazon took elaborate steps to mislead its drivers and conceal its theft, sending them canned responses that repeated the company's lies. The complaint charges that Amazon executives chose not to alter the practice, instead viewing drivers' complaints as a "PR risk," which they sought to contain through deception.[6]

Amazon's scheme ended after it was exposed, but it likely produced significant benefits for the company. First, by promising a higher base pay initially, Amazon was likely able to recruit drivers more quickly, particularly as the company tried to stand up Amazon Flex in time for the holiday season.[7] Second, and most directly, Amazon's bait-and-switch allowed the company to pocket more than $60 million in workers' tips.[8] And finally, by allegedly misleading its workers about their earnings, the company made it less likely drivers would seek better opportunities elsewhere, helping Amazon attract and retain workers in its quest to dominate.[9]

By the time this scheme was exposed in late 2019, Amazon Flex was far more established. In fact, that same year, the company quietly disclosed that it was slashing drivers' minimum pay by more than 15 percent, relative to what it promised in 2015.[10] This conduct raises serious questions about how Amazon amassed and wielded its market power. Fortunately, today's action to redress the company's victims does not prevent

entire workforce, still a substantial number. *See* U.S. Bureau of Labor Statistics, *Electronically mediated work: new questions in the Contingent Worker Supplement*, U.S. Dep't of Labor (Sept. 2018), *https://www.bls.gov/opub/mlr/2018/article/electronically-mediated-work-new-questions-in-the-contingent-worker-supplement.htm*.

[2] *See* Mastercard & Kaiser Associates, *The Global Gig Economy: Capitalizing on a ~$500 Billion Opportunity* (May 2019) at 2, *https://newsroom.mastercard.com/wp-content/uploads/2019/05/Gig-Economy-White-Paper-May-2019.pdf*. Another study estimated that spending on gig platforms was increasing 43% year-on-year in 2018. *See* Uber, *Working Together: Priorities to enhance the quality and security of independent work in the United States* (Aug. 10, 2020) at 5, *https://ubernewsroomapi.10upcdn.com/wp-content/uploads/2020/08/Working-Together-Priorities.pdf* ("Uber Report") (citing Staffing Industry Analysts, The Gig Economy and Human Cloud Landscape (2019)). By way of example, the number of Uber drivers in the U.S. has grown from 160,000 in 2014 to 1 million in 2020. *See* Jonathan V. Hall & Alan B. Krueger, *An Analysis of the Labor Market for Uber's Driver-Partners in the United States* at 1 (Princeton U. Indus. Relations Section, Working Paper No. 587, Jan. 2015), *https://dataspace.princeton.edu/bitstream/88435/dsp010z708z67d/5/587.pdf*; Uber Report.

[3] *See* Laura Stevens, *Amazon Drives Deeper Into Package Delivery*, Wall Street J. (June 28, 2018), *https://www.wsj.com/articles/amazon-drives-deeper-into-package-delivery-1530158460*.

[4] Compl., In the Matter of Amazon, Inc., Fed. Trade Comm'n File 1923123, ¶¶ 17–20.

[5] *Id.* ¶¶ 30–34.

[6] *Id.* ¶¶ 35–47.

[7] Shortly after launching Flex, Amazon noted that it was trying to "ramp quickly" in anticipation of the holiday season, Prime Day, and other periods of high demand. *See* Becky Yerak, *Uber for packages? Amazon looking for drivers to deliver goods*, Chicago Tribune (Oct. 9, 2015), *https://www.chicagotribune.com/business/ct-amazon-flex-chicago-1009-biz-20151009-story.html*.

[8] Compl., *supra* note 2, ¶ 8.

[9] During the period of the alleged lawbreaking, gig workers were reportedly in high demand. *See* Christopher Mims, *In a Tight Labor Market, Gig Workers Get Harder to Please*, Wall Street J. (May 4, 2019), *https://www.wsj.com/articles/in-a-tight-labor-market-gig-workers-get-harder-to-please-11556942404*.

[10] After Amazon's scheme was exposed, the company indicated that it would begin paying drivers a minimum of $15 per hour. *See* Chaim Gartenberg, *Amazon will no longer use tips to pay delivery drivers' base salaries*, The Verge (Aug. 22, 2019), *https://www.theverge.com/2019/8/22/20828550/amazon-delivery-drivers-tips-end-base-salaries-flex*. This was a significant reduction from the $18 promised in 2015, particularly when adjusted for cost of living.

the FTC or state attorneys general from assessing whether Amazon has engaged in a broader pattern of unfair practices in violation of the antitrust laws.

Today's order provides substantial redress to the families victimized by Amazon's anticompetitive deception. However, this cannot be the only action we take to protect workers and families from dominant middlemen. The FTC will also need to carefully examine whether tech platforms are engaging in anticompetitive conduct that hoodwinks workers and crushes law-abiding competitors.[11]

The Commission has historically taken a lax approach to worker abuse, entering no-consequences settlements even in naked wage-fixing matters that are criminal in nature.[12] Despite broad pronouncements about a commitment to policing markets for anticompetitive conduct that harms workers,[13] the FTC has done little. I hope today's action turns the page on this era of inaction.

I also agree with Acting Chairwoman Slaughter and Commissioner Phillips that preying on workers justifies punitive measures far beyond the restitution provided here, and I believe the FTC should act now to deploy dormant authorities to trigger civil penalties and other relief in cases like this one.[14]

[11] I have previously outlined certain steps that regulators can take to address anticompetitive practices in labor markets. Comment Submission of Commissioner Chopra to Department of Justice Initiative on Labor Market Competition (Sept. 18, 2019), *https://www.ftc.gov/public-statements/2019/09/comment-submission-commissioner-chopra-department-justice-initiative-labor.*

[12] In 2019, the FTC agreed to a no-consequences settlement with respondents charged with blatant wage-fixing. *See* Dissenting Statement of Commissioner Rohit Chopra In the Matter of Your Therapy Source, Neeraj Jindal and Sheri Yarbray, Fed. Trade Comm'n File No. 1710134 (Oct. 31, 2109), *https://www.ftc.gov/public-statements/2019/10/dissenting-statement-commissioner-rohit-chopra-matter-your-therapy-source.* Respondent Neeraj Jindal was later indicted by the United States Department of Justice. Press Release, U.S. Dep't of Justice, Former Owner of Health Care Staffing Company Indicted for Wage Fixing (Dec. 10, 2020), *https://www.justice.gov/opa/pr/former-owner-health-care-staffing-company-indicted-wage-fixing.*

[13] *See, e.g.,* Press Release, Fed. Trade Comm'n, FTC and DOJ Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation (Oct. 20, 2016), *https://www.ftc.gov/news-events/press-releases/2016/10/ftc-doj-release-guidance-human-resource-professionals-how.*

[14] Under its status quo approach, the FTC does not seek civil penalties for this type of abuse. But this can change. In the short term, the Commission can deploy its Penalty Offense Authority to apprise market participants, using existing administrative orders, that it is a penalty offense to recruit workers based on false earnings claims. *See Rohit Chopra & Samuel A.A. Levine, The Case for Resurrecting the FTC Act's Penalty Offense Authority* (Oct. 29, 2020), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3721256.* The Commission can also codify

Companies should succeed only when they compete, not when they cheat or abuse their power. While *Amazon.com* is one of the largest, most powerful, and most feared firms in the world, the company cannot be above the law. Regulators and enforcers in the United States and around the globe can no longer turn a blind eye.

[FR Doc. 2021–02705 Filed 2–9–21; 8:45 am]

**BILLING CODE 6750–01–P**

---

# DEPARTMENT OF DEFENSE

# GENERAL SERVICES ADMINISTRATION

# NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[OMB Control No. 9000–0142; Docket No. 2021–0053; Sequence No. 4]**

## Information Collection; Past Performance Information

**AGENCY:** Department of Defense (DOD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Notice and request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, and the Office of Management and Budget (OMB) regulations, DoD, GSA, and NASA invite the public to comment on a revision and renewal concerning past performance information. DoD, GSA, and NASA invite comments on: Whether the proposed collection of information is necessary for the proper performance of the functions of Federal Government acquisitions, including whether the information will have practical utility; the accuracy of the estimate of the burden of the proposed information collection; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the information collection on respondents, including the use of automated collection techniques or other forms of information technology. OMB has approved this information collection for use through April 30, 2021. DoD, GSA, and NASA propose that OMB extend its approval

existing precedent into a Restatement Rulemaking to trigger penalties and damages for this type of fraud. *See* Statement of Commissioner Rohit Chopra Regarding the Report to Congress on Protecting Older Consumers, Fed. Trade Comm'n File No. P144400 (Oct. 19, 2020) *https://www.ftc.gov/public-statements/2020/10/statement-commissioner-rohit-chopra-regarding-report-congress-protecting.* Such a rule would impose no burden on market participants, while ensuring real deterrence for practices that undercut workers and competitors.

for use for three additional years beyond the current expiration date.

**DATES:** DoD, GSA, and NASA will consider all comments received by April 12, 2021.

**ADDRESSES:** DoD, GSA, and NASA invite interested persons to submit comments on this collection through *http://www.regulations.gov* and follow the instructions on the site. This website provides the ability to type short comments directly into the comment field or attach a file for lengthier comments. If there are difficulties submitting comments, contact the GSA Regulatory Secretariat Division at 202–501–4755 or *GSARegSec@gsa.gov.*

*Instructions:* All items submitted must cite OMB Control No. 9000–0142, Past Performance Information. Comments received generally will be posted without change to *http://www.regulations.gov,* including any personal and/or business confidential information provided. To confirm receipt of your comment(s), please check *www.regulations.gov,* approximately two-to-three days after submission to verify posting.

**FOR FURTHER INFORMATION CONTACT:** Zenaida Delgado, Procurement Analyst, at telephone 202–969–7207, or *zenaida.delgado@gsa.gov.*

**SUPPLEMENTARY INFORMATION:**

## A. OMB Control Number, Title, and any Associated Form(s)

9000–0142, Past Performance Information.

## B. Need and Uses

This clearance covers the information that offerors and contractors must submit to comply with the following Federal Acquisition Regulation (FAR) requirements:

*Preaward.* For responses during source selection.

• *FAR 15.305(a)(2)(ii).* This section requires solicitations describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and providing offerors an opportunity to identify past or current contracts (including Federal, State, and local government and private) for efforts similar to the Government requirement. Solicitations also must authorize offerors to provide information on problems encountered on their identified contracts and the offeror corrective actions. Per FAR 15.304(c)(3), past performance must be evaluated in all source selections for negotiated competitive acquisitions expected to exceed the simplified acquisition threshold (SAT) unless the contracting

PLAINTIFF000023